IN RE RAY H. DAUGHERTY.— — S. W. —.

Springfield Court of Appeals. August 12, 1938.

*Franklin E. Reagan* and *Paul M. Peterson* for informants.

*Collins & Pierce* for respondent.

LANDIS, S. P.—This proceeding was instituted in this Court by the State Bar Committee for the purpose of disciplining or disbarring Ray H. Daugherty, a member of the Greene County Bar.

Under the authority of an order appointing him as Special Commissioner to take evidence and report a finding of fact and law, A. W. Landis of West Plains, Missouri, held a hearing at Springfield, Missouri, on December 2, 3 and 4, 1937, and now having taken the case under advisement and upon a consideration of all the evidence and the briefs of the parties, reports herewith his finding of fact, conclusions of law and recommendations in said cause.

Ray H. Daugherty, the respondent was twenty-eight years of age at the time of the hearing. He had been admitted to the Missouri Bar in April, 1931, after attending one term in a law school and without preliminary college education. After his admission to the bar, he practiced law in Springfield, Missouri, until the spring of 1937, when

he closed his office and accompanied by his wife sojourned for several months in Arkansas and Louisiana, returning to Springfield after this proceeding was filed and after notice of its pendency had been given by publication.

The information filed by the Bar Committee embraces four specific charges of professional misconduct, followed by a general charge of such abuse of duty and privilege as an attorney to bring his profession into disrepute. The specific charges are as follows:

1st. The solicitation of a lawsuit from one Alta Sloan.

2nd. The solicitation of a lawsuit from one Mary Bilyeu.

3rd. The solicitation of lawsuits from various persons in the years 1935, 1936 and 1937.

4th. Unethical and contemptuous conduct in evading service of a subpoena and in concealing his whereabouts to avoid being called as a witness in a disbarment proceeding against one H. A. Gardner.

(1) The testimony bearing upon the charge of soliciting a lawsuit from Alta Sloan warrants the following finding of fact:

Alta Sloan lived in December, 1935, on a farm near Siloam Springs, Arkansas. Her husband, George Sloan, was employed as a laborer in or near Springfield, Missouri, and while so engaged was killed, a truck belonging to the Shell Petroleum Corporation being involved in his death. Sloan's mother lived in Springfield, as did several of his brothers and other kin. These Springfield relatives were immediately notified of his death, and almost as soon it came to the attention of one M. M. Roberts. Roberts, who testified at the trial, described himself as an "investigator." The informants contend, and the evidence tends strongly to substantiate the contention, that he was in fact a "runner" engaged in the solicitation of personal injury claims and suits for certain lawyers in Springfield and its vicinity.

The testimony is not clear whether Roberts imparted to the respondent information as to the death of Sloan, or whether the news came to the respondent from some other source, nor does the Commissioner regard this as material for, regardless of how it arose, the evidence clearly shows that there existed between the respondent and Roberts within a day or two after Sloan was killed a community of understanding and purpose looking toward the obtainment of Alta Sloan's claim for damages by reason of her husband's death.

George Sloan was killed on a Saturday night. Either on Monday or Tuesday following, Daugherty, accompanied by Roberts and by Walter Sloan, a brother, and Gilbert Cook, a brother-in-law, of the deceased visited Mrs. Sloan at her Arkansas home.

Pursuant to an arrangement which had been made the preceding day, they left Springfield at an early hour in Daugherty's car, ar-

riving at the Sloan farm in the afternoon. As they approached their destination, they saw an automobile in front of the Sloan residence whereupon Daugherty drove his car to a place where it could not be seen from the road and parked. Sloan and Cook proceeded on foot, Daugherty and Roberts remaining with the car. In a short time Sloan and Cook returned with the news that the strange car belonged to a Springfield attorney who, as a representative of the Shell Petroleum Corporation, or its insurer, was discussing a settlement with Mrs. Sloan. Daugherty and his three companions waited until they saw this attorney's car pass down the road, when the four of them repaired to the Sloan residence. Daugherty and Roberts were introduced to the widow and straightway began a discussion of her husband's death and the possibility of a recovery from the Shell Corporation. Mrs. Sloan appears to have shown some reluctance toward the employment of an attorney. Roberts exhibited photostatic copies of checks in settlement of damage suits and claims of clients represented by Gardner and also newspaper clippings giving accounts of large verdicts in his cases. Mrs. Sloan was given to understand that she would have the benefit of Gardner's assistance if she agreed to a contract. After a time Mrs. Sloan consented to the employment of Daugherty and accompanied Roberts and him to the county seat where she was granted letters of administration upon the estate of her late husband (Daugherty paying the court costs). Daugherty had brought with him a supply of printed or typewritten forms of attorney lien contracts. He filled in the necessary blanks, writing his and Gardner's names in the body of the instrument and signing both for himself and Gardner after Mrs. Sloan had signed. The contract was executed in duplicate. After taking Mrs. Sloan to her home, Daugherty and his party began their return journey to Springfield, taking a route which took them through Neosho. They stayed overnight in Neosho and completed the return trip the next morning, stopping however at Monett, which was Gardner's home. While a repairman at a filling station changed a tire, Roberts and Daugherty called at Gardner's office and Daugherty informed Gardner he had obtained the Sloan contract. Gardner expressed doubt as to whether the case was "worth fooling with," but later he and Daugherty filed the suit in Christian County, which was dismissed before trial.

The Commissioner is of the belief and so finds that the evidence on the charge of unprofessional conduct in the solicitation of the Sloan case unerringly points to the guilt of the respondent. Even if, as claimed by respondent, his services were first sought out by the Springfield relatives of George Sloan, and without solicitation, his subsequent participation in the disgusting episode at the George Sloan home in Arkansas within a few days after Sloan's death and while

his body remained unburied in the Springfield morgue, was unprofessional and undignified and merits punishment.

(2) The charge of solicitation of a lawsuit from Mary Bilyeu is largely based upon the testimony of Royal Bilyeu, her husband. Mary was at the time of the hearing confined in a penal institution. Royal Bilyeu testified he had been brought back to Missouri from Colorado under a warrant charging him with being "an accessory to rape." His wife was returned at the same time. The exact nature of the charge against her was not brought out, but it appears that she and her husband were released, and Royal testified that within a few minutes after they were discharged the respondent informed him and his wife they had a good case against the Springfield officers who had caused their arrest and return to Missouri, and requested that they call at his office; that he and his father did call at Daugherty's office, but that Daugherty did not bring a suit for them. Royal's testimony was contradicted by his father, Ben Bilyeu, in every essential detail, who testified that he first consulted Daugherty in regard to a damage suit on behalf of his son and that Daugherty did not solicit the case.

Royal's credibility was impeached by substantial business men and by Willard Tucker, a reputable young member of the Springfield bar.

The Commissioner gave no credence to the testimony of Royal Bilyeu. In addition to the impeachment of his credibility, his testimony abounded in self contradictions and his very appearance and demeanor impressed the Commissioner as that of a shifty, unprincipled individual, utterly unworthy of belief. The Commissioner finds the respondent not guilty of this charge.

(3) The charge that Daugherty solicited a lawsuit from George Massengill is, in the opinion of the Commissioner, without merit. Massengill had been previously convicted three times and was on the occasion in question confined in the Greene County jail under a burglary and larceny charge. He had no counsel. Daugherty was in the jail corridor and at the suggestion of one Fred Neering, Massengill called Daugherty to his cell, discussed his case, and employed him in his defense. Daugherty testified he went to the jail at the request of a woman named Bess who claimed to be a friend of Massengill and who told him that Massengill had sent her to find a lawyer for him. Massengill admitted he knew such a woman, but did not know whether she asked Daugherty to call at the jail. He testified that he employed Daugherty of his own accord and paid him a fee of $15. The evidence shows no misconduct of the respondent in his connection with the Massengill case.

Under the general charge of misconduct, informants attempted to show that Daugherty had collected and retained $10 from one Lourene Nelson under the misrepresentation that such sum was a necessary

deposit as court costs. Mrs. Nelson and her husband were divorced and she had been awarded the custody of a minor child. Having received a letter from her former husband informing her of his intention to institute an action to have the Court award him the custody of the child, Mrs. Nelson sought the counsel of Daugherty who advised her of her rights, drafted a statement in the form of an affidavit to be signed by her neighbors testifying to her good reputation and conduct, and on two or three other occasions discussed the proceedings which she apprehended her husband was about to file.

She paid Daugherty $10 and testified that he told her it was a deposit for court costs. Daugherty denied making any statement as to the $10 being court costs, but claimed it was payment on his agreed fee of $25 for handling the case. His version of the transaction is much more believable than Mrs. Nelson's, and in any event the sum of $10 was a modest fee for the services he performed. Although she had no previous acquaintance with Daugherty and could assign no reason why she should be the object of a gratuity, Mrs. Nelson's testimony indicated that she intended to pay Daugherty nothing for his services and expected him to protect her interests gratis if she would pay the court costs. Her preposterous story falls of its own weight, and the commissioner finds nothing censurable of Daugherty's conduct in this transaction.

Likewise, without merit is the charge that Daugherty failed to account to one Noah Jones for a note of $105 which Jones had delivered to Daugherty for collection. Jones admitted that Daugherty had taken a judgment on the note for him in Justice Court and that Jones had made no investigation as to whether anything had been paid on the judgment nor whether the debtor had any property, although both Jones and his debtor lived in the little village of Galloway. Incidentally, Jones could not recall how many times he had been in prison, but said "they wore out one jail with me."

Jones' testimony does not, in the judgment of the Commissioner, furnish even a basis for suspicion of misconduct on the part of respondent in the handling of his collection, and it is recommended that the respondent be exonerated of this charge.

(4) The evidence in respect of respondent's actions and conduct in evading service of process and in avoiding the giving of testimony in the Gardner disbarment proceeding discloses, in the judgment of the commissioner, a most serious breach of professional duty. Daugherty had testified at an investigation of Gardner before the Bar Committee. Charges were thereafter preferred against Gardner and the Bar Committee caused a subpoena to be issued for Daugherty, but he could not be located although officers searched for him over a period of several weeks. The newspapers gave his disappearance wide

publicity. Creditors seized his library and office furniture under an attachment, and this too was much publicized in the press.

Daugherty testified that he and his wife were in search of a new location, that they lived during the months of their absence from Springfield at tourist camps in various cities and towns in Arkansas and Louisiana, and that he was completely out of touch with events which were transpiring in Springfield while he was away. He admitted, however, that one reason for his hasty departure and prolonged absence was a disinclination on his part to testify against Gardner. He sought to justify or at least to condone his attitude on two grounds:

1st. Loyalty to Gardner, who had befriended him professionally and otherwise.

2nd. Because he had received harsh and abusive treatment by the Committee at their investigation of Gardner, and feared a recurrence at the hearing before the Commissioner.

The commissioner can understand why Daugherty out of a sense of loyalty and gratitude probably felt under obligation to Gardner, who Daugherty states was his benefactor and friend when Daugherty was experiencing difficulty in making a living, but cannot agree with respondent that this was an excuse for his actions, for his testimony, if he was not a party to unworthy conduct, should have been helpful rather than damaging to Gardner. But be that as it may, his obligation to his profession and to the courts was paramount to personal friendships and attachments, and while the predicament was most painful and embarrassing, it was caused in part at least by the respondent's own improprieties, and in any event, he chose the wrong way out. Nor can the commissioner agree with respondent's contention that his treatment at the hands of the Bar Committee was such as to justify him in hiding away so he could not be called as a witness before the commissioner who heard the Gardner case. That portion of his examination before the bar committee of which the respondent complains is as follows:

· ''Mr. Clark: Now, listen, here is the situation this thing appears to be in; you have been on the stand here for forty-five minutes. You have fenced with Mr. Parks, you have hesitated, you have hedged. It seems to me that a lawyer whose conscience is clear and·who is guilty of no misdemeanor whatever and he comes before the committee he would be anxious and willing to tell everything he knows. Now, the impression on me and I think on the rest of this committee and everybody within the sound of your voice is that you are concealing everything you can. Now, if you think you are going to get any consideration from the committee by reason of your conduct in that regard,. whether it be to protect yourself or to protect Gardner, you are not going to get away with it.

"THE WITNESS: Well, I want to tell you the truth about it.

"MR. CLARK: The only chance you have got as far as I am concerned is to turn right around now and tell us the truth. We know that you have been mixed up with Gardner right along. We know that you and Gardner have even contemplated forming a partnership. We know that you have been in continuous contact with Gardner's runners. We know that you have been running cases for Gardner. Now then, you just as well come clean if you want to save any part of your professional life. I can tell you that right now.

"THE WITNESS: I am telling you the truth about this.

"MR. CLARK: No, you are not. You are not. You have misrepresented the facts. You have lied to this committee for an hour. You are not getting anywhere with it at all. Now, it is rough to have to say that to you, but you are not getting anywhere.

"THE WITNESS: I made the trip. There is no question about that.

"MR. CLARK: Tell us the truth about it. Tell us everything. A. I have tried to.

"Q. No. Now, listen. . . . A. What do you want to know.

"Q. I want to know all of your relationship, your business transactions, your professional transactions, your skullduggery with Gardner. I want to know it all. This is the only chance you have got and if you don't come clean. . . . A. I handled some cases for Gardner, yes.

"Q. Tell us all about them, tell us the things you have done. Trust us. If you can't trust us you can't trust anybody. You will have to trust to our good judgment as to what we are going to do. A. What cases do you want to know about?

"Q. All of them. You know. All of them. Tell us everything that you have been doing. Tell us your connection with this fellow. A. I have handled some cases for him, yes.

"Q. Tell us about them. Just how you got them. Tell us what you have done to get cases for him. Tell us about your relationship with this fellow Roberts. Tell us how you and Roberts have gone around here and gotten cases. Tell us about, the truth about how you went down there and hid the car behind the barn and sneaked up there. I don't blame you for being ashamed of it. But you are not getting anywhere. A. I did drive out behind the barn there, I told you that.

MR. CLARK: I can't hold out any hope for you at all, but the only possibility is to rely upon the good judgment and the generosity of this committee, and the only way you are going to appeal to them is to tell us the truth and make a complete fair, frank confession of it. If you don't do it you are a gone gosling. Q. Wasn't he, don't you know? A. Well, as a matter of fact, I do not but it is my information that he was, yes.

"By Mr. Parks: So Mr. Roberts was representing Mr. Gardner too, wasn't he? A. He may have been, yes.

"Q. Wasn't he, don't you know? A. Well, as a matter of fact I do not, but it is my information that he was, yes.

"By Mr. Clark: That is such an equivocation. My goodness alive. That is all. A. I think he probably was.

"Mr. Clark: Oh, don't answer probably and think this, that and the other. You can make a direct statement if you wanted to do it.

"The Witness: I want to tell you all the truth on that.

"Mr. Clark: Well, you have had an hour and a half to do it.

"The Witness: But anything I can tell you.

"Mr. Clark: Be back at one-thirty.

"The Witness: That is certainly the truth.

"Mr. Clark: You will never make me believe that."

The chairman of the Bar Committee testified that this part of Daugherty's examination occurred after the committee had examined him at length, and after the committee had decided he was shielding Gardner, and when the members were exasperated by the evasive and unsatisfactory answers of the witness. He testified that all the members of the committee questioned the witness and it was probable that he and the others walked about the room and at times stood in front of the witness and pointed their fingers at him as he was interrogated.

While the quoted language of the chairman is not a model of elegance, and the proceedings would probably have been equally efficacious and certainly more dignified had the members of the committee restrained their emotions and been observant of those rules of decorum which solemnize and create respect for judicial proceedings generally, still the commissioner finds nothing in this record to justify or excuse the respondent's hegira to Arkansas and Louisiana. As a lawyer, respondent should have known that at the Gardner hearing his every right as a lawyer, as a witness, and as a citizen would be scrupulously protected by the commissioner who was to hear the case. He must have realized too that his actions amounted to a direct affront to this court and in addition to this he could not have anticipated otherwise than that there would be widespread and unfavorable publicity, bringing his profession into general public disrepute, and which is equally devastating, into general public ridicule.

In their briefs, informants strongly urge a recommendation of disbarment, but after a careful study of all the evidence, and giving due consideration to the punishment which has been meted in other cases where the facts and circumstances have shown a breach of conduct as serious as those disclosed in this record, the commissioner has reached the conclusion that the ends of justice will be met and the dignity of the profession upheld by the respondent being suspended

from practice for a period of one year, and the commissioner recommends a suspension for such period.

PER CURIAM:—The report of our special commissioner as above set forth is hereby adopted as and for the opinion of this court, and it is the order and judgment of this court that the license of respondent, Ray H. Daugherty, to practice law in the courts of the State of Missouri shall be suspended for a period of one year from the effective date of the judgment herein, and that the costs be assessed against respondent.